# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**CHARLES H. MONTGOMERY,**

      **Petitioner,**

**-vs-**                                  **Case No.  6:06-cv-1344-Orl-22GJK**

**UNITED STATES OF AMERICA,**

      **Respondent.**

_____

# ORDER

## I.  INTRODUCTION

Petitioner Charles H. Montgomery moves to vacate, set aside, or correct his federal sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 10.)  He alleges fourteen claims for relief: thirteen claims that he received ineffective assistance of trial counsel (claims one, two, and four through fourteen)[1] and  one claim that heightened security measures imposed on him during his pre-trial detention violated  his right to counsel and due process (claim three).  After carefully considering the record and the parties' legal arguments, the Court determines that Petitioner has failed to demonstrate entitlement to post-conviction relief.  Accordingly, Petitioner's amended § 2255 motion will be denied.

---

[1]Claim nine also incorporates allegations that this Court denied Petitioner's constitutional rights when it failed to inform Petitioner of his counsel's motion to withdraw, failed to hold a hearing on that motion, and denied the motion.

## II. PROCEDURAL HISTORY

Petitioner and his brother, Michael Montgomery, were charged in a Second Superseding Indictment with conspiracy to possess with intent to distribute, and conspiracy to distribute, 500 grams or more of cocaine hydrochloride and 50 grams or more of crack cocaine (count one); possession with intent to distribute cocaine hydrochloride (counts four and eight);[2] and possession with intent to distribute five grams or more of crack cocaine (counts five and nine)[3] (Criminal Case 6:03-cr-210-Orl-22GJK, Doc. No. 79).[4]   The Second Superseding Indictment also charged Petitioner - alone - with possession with intent to distribute, and distribution of, crack cocaine (count two); possession of firearms in furtherance of a drug trafficking offense (counts six and ten);[5] and possession of firearms and ammunition by a convicted felon (counts seven and eleven).[6] [7] (*Id.*)

---

[2]These counts charged offenses on different dates.

[3]*See supra* note 2.

[4]Henceforth, documents in criminal case number 6:03-cr-210-Orl-22GJK will be cited as "Crim. Doc. No. ____."

[5]*See supra* note 2.

[6]*See supra* note 2.

[7]Count three of the Second Superseding Indictment charged a drug offense against Michael Montgomery alone.

Petitioner was tried alone in early February of 2004,[8] and the jury convicted him on all counts.  (Crim. Doc. No. 107.)  The Court sentenced Petitioner to a prison term of life plus 360 months.  (Crim. Doc. No. 137.)

Petitioner's trial counsel, Travis Williams, filed a notice of appeal on April 23, 2004. (Crim. Doc. No. 134.)  Thereafter, the assigned Magistrate Judge granted Williams permission to withdraw as Petitioner's counsel, and appointed another attorney to represent Petitioner on appeal. (Crim. Doc. Nos. 138, 142.)

On March 14, 2006, the Court of Appeals for the Eleventh Circuit issued an unpublished, per curiam opinion affirming Petitioner's convictions and sentences.  *United States v. Montgomery,* 152 Fed. Appx. 822 (11th Cir. 2005) (Crim. Doc. No. 196).[9]  The Supreme Court denied certiorari on February 21, 2006.  *Montgomery v. United States,* 546 U.S. 1197 (2006).

Petitioner filed his amended § 2255 motion on October 2, 2006.[10]  (Doc. No. 10.)  The Government filed a response (Doc. No. 19) to the amended § 2255 motion in compliance with this Court's instructions and with *The Rules Governing Section 2255 Proceedings for the United States District Courts*.  At the Court's invitation (Doc. No. 20), Petitioner filed a reply (Doc. No. 26) to

---

[8]Michael Montgomery was not arrested until shortly before Petitioner's trial.

[9]The Eleventh Circuit's opinion was issued on October 7, 2005, but the mandate did not issue until March 14, 2006.  (Crim. Doc. No. 196.)

[10]The Court struck the legal memorandum (Doc. No. 2) supporting Petitioner's initially-filed § 2255 motion because it exceeded the page length limit set forth in Local Rule 3.01(c).  (Doc. No. 4.)  After Petitioner filed his amended motion (Doc. No. 10), the Court denied the original motion as moot and directed the Government to respond to the amended motion.  (Doc. No. 11.)

the Government's response.  The Court also allowed Petitioner to supplement his motion with an additional exhibit.  (Doc. Nos. 30, 33.)

### III.  THE EVIDENCE PRESENTED AT TRIAL

Simply put, the evidence of Petitioner's guilt was overwhelming.  In fact, the Government's case against Petitioner was one of the strongest the undersigned judge has ever seen.

In brief summary, the proof at trial established that Petitioner was a long-standing and persistent purveyor of both crack cocaine and powder cocaine in the DeLand, Florida, area. Petitioner operated his business from two premises: 520 West Spring Street, notoriously known as "the Montgomery Hole,"[11] and 307 Chipola Avenue.[12]  In August of 2003, police raided 520 West Spring Street and seized drugs, guns, and other tools of the drug-dealing trade.  Undeterred by his resulting arrest on state charges, Petitioner continued to deal cocaine while out on bond. This prompted agents to raid and search the West Spring Street residence once again in October of 2003.  This second search yielded more drugs, guns, and other incriminating evidence. Contemporaneously, the agents searched Petitioner's Chipola Avenue residence pursuant to a consent obtained from Vivian Taylor, the mother of Petitioner's ex-girlfriend.  This search produced still further quantities of drugs, guns, and other evidence.  Petitioner was again arrested, but this time he remained in jail.

---

[11]For consistency's sake, the Court will use the street name, rather than the "Montgomery Hole," in referring to this location.

[12]There are references in the record to Chipola "Street," as opposed of to Chipola "Avenue." This discrepancy is immaterial.  For consistency's sake, Chipola "Avenue" will be used in this Order.

In addition to the tangible items seized as a result of these searches, the evidence against Petitioner consisted of testimony by drug users who purchased street-level quantities of powder cocaine and crack cocaine from Petitioner; testimony of other drug dealers who distributed cocaine supplied to them by Petitioner; evidence of a controlled buy in which a confidential informant ("CI") purchased crack cocaine from Petitioner; Petitioner's incriminating admission to a police detective during the first West Spring Street search, to the effect that any drugs found inside were his; and recordings of Petitioner's telephone conversations from the county jail, in which he directed others to continue his drug-dealing operation while he was incarcerated.  This is but a synopsis, a more detailed rendition of the evidence follows.

The Government introduced the testimony of a bevy of cocaine buyers and drug dealers who painted a vivid picture of Petitioner's cocaine distribution enterprise.        M e l i s s a Williams testified that she had known Petitioner for ten to twelve years.  (Crim. Doc. No. 147 at 3.)  Beginning in early 2001, Williams purchased powder cocaine from Petitioner and his brother approximately five to six times per month.  (*Id.* at 7.)  From 2001 to 2003, Petitioner sold Williams powder cocaine approximately forty to fifty times.  (*Id.* at 12-13.)  These purchases were made at the West Spring Street address.  (*Id.* at 5-13.)  Williams further testified that she saw a rifle behind the door every time she went to that location.  (*Id.* at 11.)

Eleanor Bevel also testified about purchasing cocaine from Petitioner.  In 2001 or 2002, when Bevel began using cocaine, Petitioner would either deliver powder cocaine to Bevel at her home, or she would go to the West Spring Street location to make her purchases.  (Crim. Doc. No. 147 at19-22.)  Bevel visited the West Spring Street house once or twice a week.  (*Id.* at 22.)

Eventually, Bevel began buying crack cocaine from Petitioner. (*Id.* at 23-24.) Bevel estimated that these crack purchases occurred twice a week, over a period of approximately six to eight months. (*Id.* at 23.) Each purchase of either powder cocaine or crack cocaine was in the range of $40 or less. (*Id.* at 22-24.) Usually, these drug transactions occurred outside the West Spring Street house while Petitioner was seated in a vehicle. (*Id.* at 26-27.)

Bevel testified that she was present at 520 West Spring Street on August 14, 2003, when police raided the premises. (Crim. Doc. No. 147 at 23-24, 30-31.) Bevel and Petitioner were inside the house at the time.[13] (*Id.* at 30-31.) Bevel stated she saw a rifle behind the door of the residence on that date. (*Id.* at 32.)

The Government also called Veronica Woulard, Petitioner's former girlfriend and the mother of his child. Woulard and Petitioner lived together in the Chipola Avenue residence; however, the couple separated in June or July of 2003. (Crim. Doc. No. 147 at 46, 63.) Woulard testified that Petitioner used the West Spring Street house as a place to sell drugs. (*Id.* at 53.) She stated she saw weapons in the home whenever she went there, and that drugs were present around those weapons. (*Id.*) Woulard estimated that from 1999 to 2003, she observed drugs in the home on fifty to a hundred occasions. (*Id.*) Woulard saw crack cocaine, bags, and scales inside the residence, and on fifty to a hundred occasions, she witnessed Petitioner packaging drugs inside the house. (*Id.* at 54-55.) Woulard also related that Petitioner would send "crackheads" (such as Sylvester Brown a/k/a "PeeWee") down to the street-corner with walkie talkies to acts as lookouts for the police. (*Id.* at 55-56.)

---

[13]Interestingly enough, Petitioner claims in his affidavit that Bevel did not know him personally. (App. A to Doc. No. 26, ¶ 7.)

Notwithstanding the couple's personal estrangement, Woulard continued to participate with Petitioner in drug-dealing and related activities after his incarceration.  Following Petitioner's (second) arrest on October 2, 2003, Woulard had telephone conversations with Petitioner while he was in the county jail, and she agreed to distribute drugs for him.  (Crim. Doc. No. 147 at 64.) Recordings of those telephone conversations, in which Petitioner gave Woulard coded instructions regarding locating and distributing drugs and firearms, were admitted in evidence.  Woulard also testified about following those instructions.  (*Id.* at 66-94.)

Woulard further related that while Petitioner was in jail, he instructed her to sell an Uzi firearm for him.  (Crim. Doc. No. 147 at 61-62.)  Petitioner told Woulard the weapon was his, free and clear, and that he had purchased it himself. (*Id.* at 61-62.)  Pursuant to Petitioner's instructions, Woulard sold the firearm to a pawn shop for $350.[14]  (*Id.* at 62.)

Melvin Taylor, a confidential informant, purchased crack cocaine from Petitioner on July 7, 2003.  Taylor testified that beginning in late 2001 or early 2002, he visited the West Spring Street premises four to five times per week (sometimes as often as three times a day) and bought crack cocaine from Petitioner.  (Crim. Doc. No. 147 at 108-09.)  Taylor's purchases were in the range of $5-10 to $100-200.[15]  (*Id.* at 109.)  This witness estimated that he purchased crack cocaine from Petitioner more than sixty to seventy times.  (*Id.* at 110.)  Taylor saw crack cocaine in the

---

[14]Pawnshop operator Wesley Davis testified that on November 7, 2003, he purchased a 9mm Uzi firearm for $300.00 from Woulard. (Crim. Doc. No. 148 at 251-253.)  In connection with that transaction, Woulard gave her address as 307 Chipola.  (*Id.* at 253.)

[15]Taylor believed he once bought a $20 piece of crack cocaine from Petitioner outside the Chipola Avenue residence.  (Crim. Doc. No. 147 at 122.)

West Spring Street house on "quite a few" occasions; usually, the quantity was "three to four cookies at a time." (*Id.* at 113-14.) He estimated that each cookie weighed close to an ounce. (*Id.* at 114.) One morning, Taylor saw Petitioner on a couch, half asleep, with two "big cookies" resting on his chest or stomach. (*Id.*) There was a pistol beside Petitioner on the couch. (*Id.*) On that occasion, Petitioner told Michael Montgomery to go and get Taylor some "stuff," whereupon Michael went to a cabinet, opened it, and the witness saw "a lot" of cookies inside, perhaps a hundred, individually packaged in plastic. (*Id.* at 114-15.)

During his visits to 520 West Spring Street, Taylor also saw a rifle behind the front door of the house. (Crim. Doc. No. 147 at 116.) Once, Taylor witnessed Petitioner fire the rifle down the road, in the direction of a rival drug dealer. (*Id.* at 116-17.)

Eventually, Taylor began cooperating with law enforcement, and he made a controlled buy from Petitioner on July 7, 2003. (Crim. Doc. No. 147 at 121-25.) On that occasion, Taylor purchased $60 worth of crack cocaine from Petitioner at the West Spring Street location. (*Id.*) During that transaction, Taylor wore a recording device. (*Id.*) Also, Taylor's arrival and exit from the house were captured on video. (*Id.*) Taylor testified about the controlled buy, and the accompanying audio and video recordings were admitted in evidence.[16] (*Id.* at 121-27.)

Another drug dealer, Andre Neal, testified that in 2000, he bought 4½ ounces of crack cocaine from Petitioner for $2,250 or $2,500. (Crim. Doc. No. 148 at 373-74.) This transaction took place in the restroom of a Denny's restaurant. (*Id.*) Neal related that in 2000 and 2001, he usually met Petitioner twice a week, and bought 4½ ounces of cocaine each time. (*Id.* at 374-75.)

---

[16]Taylor returned to the West Spring Street location on July 10, 2003, and bought $60 worth of crack cocaine from Michael Montgomery. (Crim. Doc. No. 147 at 128-35.)

This witness testified that he purchased that quantity at least three times per month (sometimes four) for a period of ten to twelve months.  (*Id.* at 377.)

Henry Curry testified that in early 2001, Petitioner gave him a quarter-ounce of crack cocaine to sell; Curry then sold it.  (Crim. Doc. No. 148 at 390-91.)  Approximately 1½ weeks later, Petitioner sold Curry half an ounce of crack for $300 and "fronted" him another half ounce, which Curry also sold.  (*Id.* at 392-94.)  Both of these transactions with Petitioner occurred at the West Spring Street location.  (*Id.* at 391-92.)  From January to October of 2001, Curry dealt with Petitioner about seven times and received approximately one quarter of a kilogram of crack cocaine.  (*Id.* at 397.)

William Gillon related that in February of 2001, he paid Petitioner $3,250 for a "Big 8" (6½ ounces) of crack cocaine.  (Crim. Doc. No. 149 at 414-17.)  This deal took place in the restroom of a convenience store.  (*Id.*)  Gillon then distributed the drugs.  (*Id.* at 417.)  A week later, Gillon reported, he bought 9½ ounces of crack from Petitioner for $3,250.  (*Id.* at 417-18.)  In October of 2001, Gillon bought another 6½ ounces of crack from Petitioner for the same sum.  (*Id.* at 418-22.)     Anthony Whites testified that in July of 2001, he bought four ounces of crack cocaine from Petitioner for $2,400 at "his house."[17]  (Crim. Doc. No. 149 at 430-33.)  Whites then sold the drugs in South Carolina.  (*Id.* at 433.)  The next month, Whites bought two more ounces from Petitioner for $1,200.  (*Id.* at 433-34.)  This transaction also occurred at the West Spring Street residence.  (*Id.* at 434.)

---

[17]Whites' later testimony about a subsequent drug purchase indicates that "his house" referred to the West Spring Street premises.  (Crim. Doc. No. 149 at 434.)

Drug-dealer Kenta Hill related that he had known Petitioner his entire life. (Crim. Doc. No. 149 at 438.)  Hill testified that after he was released from a halfway house in October of 2000, he bought small quantities ($100-$200) of crack cocaine on two to four occasions from Petitioner. (*Id.* at 440-44.)  Hill "pieced-up" these drugs and re-sold them.  (*Id.*)

Another dealer, Charles Damon, testified that he had known Petitioner since the seventh or eighth grade.  (Crim. Doc. No. 149 at 448-49, 461.)  In 2002 or 2003, Damon bought drugs from Petitioner on a couple of occasions.[18]  (*Id.* at 449.)  More specifically, this witness said he bought a quarter-ounce of crack cocaine from Petitioner for $200, then sold it.   (*Id.* at 450.) Approximately six months later, in 2003, Damon visited the West Spring Street location and bought another quarter-ounce of crack cocaine from Petitioner for $200, then re-sold it.[19]  (*Id.* at 450-52.)

On September 30 or 31, 2003, Damon attempted to purchase drugs from Petitioner in a controlled buy conducted by law enforcement.  (Crim. Doc. No. 149 at 452.)  The witness was given $100 and instructed to purchase crack cocaine from Petitioner; he was equipped with a body transmitter.  (*Id.* at 452-53.)  Damon did not succeed in buying crack cocaine from Petitioner. However, during the conversation between Petitioner and Damon, Petitioner used street slang to

---

[18]In his opening questions to Damon regarding his dealings with Petitioner, the prosecutor referenced the years 2000 and 2001.  (Crim. Doc. No. 149 at 449.)  However, considering Damon's testimony in its entirety, it is clear that the transactions about which he testified occurred in 2002 and/or 2003.  (*Id.* at 449-51.)

[19]Later in his testimony, Damon described a transaction that occurred at 520 West Spring Street in mid-2003, in which he purchased a quarter-ounce of drugs from Petitioner, and another quarter-ounce from Michael Montgomery, for a total sum of $400.  (Crim. Doc. No. 149 at 460-61.) It is unclear whether this is one of the "couple" of instances of drug-dealing involving Petitioner, about which Damon had already testified, or a separate transaction.

indicate that he had powder cocaine, but not crack cocaine, as he was trying to stay away from the latter form of the drug.  (*Id.* at 453-54.)

Jerry Stone, one of Petitioner's principal drug-dealing associates, testified that he became involved in a drug relationship with Petitioner approximately 1½ years prior to trial at Petitioner's West Spring Street house.[20]  (Crim. Doc. No. 149 at 475-76.)  Stone bought crack cocaine from Petitioner as often as three to four times per week, then re-sold it.  (*Id.* at 476.)  Stone started out buying $100 worth of the drug, then reached half-ounce quantities, and finally graduated to one-ounce deals.  (*Id.*)  Stone further testified that he distributed drugs for Petitioner ten to twelve times.  (*Id.* at 480.)  Stone was present at the West Spring Street location when large quantities - half kilograms - of powder cocaine were delivered.  (*Id.* at 477.)  Stone stated that Petitioner, assisted by his brother, Michael, would sub-divide the half-kilograms into ounces.  (*Id.* at 477-78.)  The two brothers cooked-up part of the powder cocaine, converted it into crack, and then sold it.  (*Id.* at 478-79.)

During some months in the 1½ years Stone frequented the West Spring Street premises, as many as three to four kilograms of cocaine were passing through the residence.  (Crim. Doc. No. 149 at 490-91.)  Other times, when supply was scarce, Petitioner was forced to buy smaller quantities, such as a "couple ounces or so."  (*Id.*)  According to Stone, however, Petitioner usually bought in half-kilogram lots.  (*Id.* at 491.)

Stone related that the West Spring Street house was generally open for business as a place to buy drugs.  (Crim. Doc. No. 149 at 482.)  Sometimes, he said, sales occurred around the clock,

---

[20]Stone was on the porch of the West Spring Street house when the first drug raid occurred on August 14, 2003.  (Crim. Doc. No. 149 at 481.)

seven days a week.  (*Id.*)  Traffic was heaviest on Fridays, Saturdays, and the first of the month.

(*Id.*)  On Friday nights when Stone was present, as many as fifty people might stop by the house

to buy both powder cocaine and crack cocaine.  (*Id.* at 483-84.)

Even after the first drug raid on August 14, 2003, Stone remained in the drug business with

Petitioner.  (Crim. Doc. No. 149 at 487.)  Stone, Petitioner, and Michael Montgomery continued

to sell crack from the West Spring Street house after that date.  (*Id.* at 487-88.)

After the second drug raid and Petitioner's re-arrest on October 2, 2003, Veronica Woulard

provided Stone with two ounces of cocaine, half "hard" and half "soft."[21]  (Crim. Doc. No. 149 at

489.)  Stone also relocated weapons after that date at Woulard's direction.  (*Id.* at 489-90.)

Additionally, Stone testified about seeing firearms in the West Spring Street residence.

(Crim. Doc. No. 149 at 479-80.)  These guns consisted of a rifle belonging to Petitioner that was

located behind the door, and one or two pistols.  (*Id.*)  Stone reported that Petitioner and Michael

Montgomery moved the firearms around the premises.  (*Id.*)

In addition to Petitioner's customers and criminal associates, the Government called a host

of officers and agents to testify about the law enforcement operations carried out in the course of

their investigation of Petitioner.

Joseph Sanchez, a City of DeLand police detective, recounted the procedures employed in

the controlled buy conducted on July 7, 2003.  (Crim. Doc. No. 147 at 144-152.)  Sanchez assumed

---

[21]In the trial transcript, the prosecutor referred to *August* 2, 2003, rather than *October* 2, 2003, in connection with this transaction.  (Crim. Doc. No. 149 at 489.)  However, it is apparent from Stone's preceding and  succeeding testimony that the prosecutor misspoke, and the date in question was October 2, 2003, the day the West Spring Street residence was searched a second time.  (*Id.* at 488-90.)

custody of the crack cocaine Melvin Taylor purchased from Petitioner on that date, and that item was admitted in evidence.  (*Id.* at 149-50.)  Sanchez also testified about the August 14, 2003, search of the West Spring Street location.  (*Id.* at 161-197.)  During the course of that search, Sanchez asked Petitioner to whom the residence belonged.  (*Id.* at 168.)  Petitioner replied that the residence was his and that he was living there alone.  (*Id.* at 168, 207.)  Additionally, after being read his Miranda rights, Petitioner told Sanchez that if any narcotics were found, they belonged to him.  (*Id.* at 168, 207.)

Through Sanchez, the Government established that the August 14th search of the West Spring Street house yielded powder cocaine, crack cocaine, a cutting agent that could be used to make crack, a digital scale, and various drug manufacturing and packaging items.  (Crim. Doc. No. 148 at 168-197.)  Two loaded rifles were found behind the front door and a small silver handgun - also loaded - was discovered in a pantry next to crack cocaine.  (*Id.* at 184-86.)  These guns were admitted in evidence.  (*Id.* at 185-86.)  Additionally, $2,450 in cash was seized from Petitioner's right front pocket, and $588 was retrieved from his left front pocket.  (*Id.* at 190-91.)

Nathan Johnson, an investigator with the Volusia County Sheriff's Office, assisted the Drug Enforcement Administration ("DEA") in the consent search of the Chipola Avenue premises on October 2, 2003.  (Crim. Doc. No. 148 at 238.)  Johnson testified that when he and other officers approached the front door of the house, he saw Vivian Taylor walking toward them.  (*Id.*)  Johnson said Taylor took some keys out of her pocket or her purse, opened the door to the residence, and admitted the officers.  (*Id.* at 238-39.)  After Johnson and his fellow officers spoke with Taylor, she consented to a search of the residence.  (*Id.* at 240.)

Johnson testified that during the search, he found a small leather zippered pouch on a couch in the family room.  (Crim. Doc. No. 148 at 240.)  Inside were Ziploc baggies containing white powder, red straws, and crack cocaine.  (*Id.* at 240-41.)  Johnson also discovered a bolt-action rifle and ammunition in a closet (*id.* at 242-43), a black digital scale on the fireplace mantle (*id.* at 246-47), and $2,300 in currency and a handgun in an upper bedroom (*id.* at 248).

Another Volusia County investigator, William Heiser, testified about contacting Vivian Taylor at the Chipola Avenue location on October 2, 2003.  (Crim. Doc. No. 148 at 262.)  After Heiser spoke with her, law enforcement personnel entered the home and Taylor signed a consent search form.  (*Id.* at 262-63.)  During the ensuing search, Heiser found a safe concealed behind a false wall in the home.  (*Id.* at 263.)  Inside were currency, bank checks in Petitioner's name, bail bond paperwork, and a copy of the search warrant executed previously at the West Spring Street premises.  (*Id.* at 263-66.)

James Ellinor, a lieutenant with the Volusia County Sheriff's Office, also testified about events at the Chipola Avenue residence on October 2, 2003.  (Crim. Doc. No. 148 at 268-69.)  Ellinor said he and three other officers obtained consent to search the premises from Vivian Taylor.  (*Id.* at 269.)  According to Ellinor, Taylor unlocked the house and invited the officers inside.  (*Id.*)  During the ensuing search, Ellinor found a .38 caliber revolver, fully loaded, in a file cabinet located in a bedroom at the top of the stairs.  (*Id.* at 270.)

Keith Dalton, the DEA task force agent who led the investigation of Petitioner, also testified.  Among other things, Dalton discussed the items found inside a safe located in the Chipola Avenue residence during the October 2, 2003, search.  Those items included mail

addressed to Petitioner at 520 West Spring Street; a copy of a bail bond receipt evidencing that Petitioner bonded-out Jerry Stone; a copy of the search warrant and return executed at West Spring Street on August 14, 2003; and a box of checks in Petitioner's name, listing his address as 520 West Spring Street.  (Crim. Doc. No. 149 at 509-11.)  Agent Dalton also testified that $31,500 in currency was seized from the Chipola residence during that search.  (*Id.* at 511.)

Various law enforcement officials testified about the October 2, 2003, search of the West Spring Street premises.  They recounted seizing powder cocaine and crack cocaine, guns, items of mail addressed to Petitioner, packaging for a "bug detector" (used to detect electronic surveillance devices), two-way radios, a drug-cutting agent known as Inositol, and a night-vision scope.  (Crim. Doc. No. 148 at 275-304, 330-355.)  Additionally, Alina Polak, an agent of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives, testified as to the interstate commerce nexus regarding the seized firearms and ammunition.  (*Id.* at 305-320.)  During Polak's testimony, a stipulation was read that Petitioner was a convicted felon.  (*Id.* at 316-17.)

At the conclusion of the Government's case, the prosecutor read another stipulation to the jury; this one concerned the seized drugs admitted in evidence.  (Crim. Doc. No. 149 at 537-40; Crim. Doc. No. 94.)  The stipulation advised the jury that specified exhibits were tested in DEA's Southeast Regional Laboratory by chemist Rita Montejo and that they were in a sealed condition upon receipt.  (Crim. Doc. No. 149 at 537; Crim. Doc. No. 94.)  The stipulation then specified the type and amount of drug for each listed exhibit.  The exhibits totaled 38.06 grams of crack cocaine

(Gov't Exs. 1, 5, 14, 16, 17, 36, 38 & 81) and 62.18 grams of cocaine hydrochloride (Gov't Exs. 12, 13, 37, 39 & 82).[22]  (Crim. Doc. No. 149 at 537-40; Crim. Doc. No. 94.)

Petitioner presented no evidence after the Government concluded its case, as was of course his right.

## IV.  ANALYSIS

### A.  Ineffective Assistance of Counsel Claims

### LEGAL STANDARDS

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court of the United States established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[23] *Id*. at 687-88.  A court must adhere to "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.  "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

---

[22]Other items covered by the stipulation included unspecified amounts of crack cocaine residue (Gov't Exs. 10(a), 10(b), 10(c), 10(d) & 41); benzocaine (a cutting agent) (Gov't Ex. 11); marijuana (Gov't Exs. 15, 42); cocaine residue, "salt undetermined" (Gov't Exs. 32, 33, 34, 35, 40 & 80); aspirin (Gov't Ex. 43); and a capsule that did not contain any controlled substance (Gov't Ex. 44).

[23]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

The United States Supreme Court has recognized exceptions to the general rule of *Strickland*.  For instance, prejudice has been presumed in extreme cases, such as when a defendant has been denied the assistance of any counsel.  *United States v. Cronic*, 466 U.S. 648, 658-59 (1984).  In addition, unless the trial court determines that no conflict exists, prejudice is presumed when defense counsel is forced to represent co-defendants despite having raised a timely objection. *Holloway v. Arkansas*, 435 U.S. 475, 488-89 (1978).  However, absent a timely objection, a conflict of interest claim premised on multiple representation of co-defendants requires a showing that an actual conflict adversely affected counsel's representation of a particular defendant before the prejudice component will be presumed.  *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980).

In order to establish that counsel's conflict of interest violated the Sixth Amendment, a petitioner must demonstrate both that an attorney labored under an actual conflict of interest and that such conflict adversely affected the attorney's representation of the client.  *Cuyler*, 446 U.S. at 348.  "[T]he possibility of conflict is insufficient to impugn a criminal conviction."  *Id*. at 350. Further, a court will not find an actual conflict of interest unless the petitioner can "point to specific instances in the record to suggest an actual conflict or impairment of [his] interest[]." *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir. 1987) (internal quotations omitted).  If the petitioner can make such a showing, the petitioner "need not demonstrate prejudice in order to obtain relief," *Cuyler*, 446 U.S. at 349-350, but only that "the conflict had some adverse effect on counsel's performance."  *McConico v. State of Ala.*, 919 F.2d 1543, 1548 (11th Cir. 1990).

The standard for evaluating a claim for post-conviction relief based on an attorney's alleged conflict of interest in situations other than those involving representation of multiple defendants

remains unclear.  In *Mickens v. Taylor*, 535 U.S. 162 (2002), the United States Supreme Court declined to decide whether the standard enunciated in *Cuyler* extends beyond the realm of multiple representation conflicts, concluding that the issue presented "an open question."  *Id.* at 176.  The Eleventh Circuit has also refrained from clearly defining the boundaries of *Cuyler*'s application to attorney conflict of interest cases.  *See, e.g.*, *Schwab v. Crosby*, 451 F.3d 1308, 1327 (11th Cir. 2006), *cert. denied*, 127 S.Ct. 1126 (2007); *Quince v. Crosby*, 360 F.3d 1259, 1263 & n.4 (11th Cir. 2004).  Likewise, this Court need not resolve the question in this case, as Petitioner's conflict-based ineffective assistance claims fail under both *Strickland* and *Cuyler*.

## CLAIMS ONE AND SEVEN

In claim one, Petitioner maintains that his defense counsel, Travis Williams, was ineffective in failing to investigate the consent Vivian Taylor gave law enforcement officers to search Petitioner's Chipola Avenue residence.  According to Petitioner, Taylor, the mother of his former girlfriend and co-conspirator, Veronica Woulard, was not living in the residence at the time she gave consent.  Petitioner maintains that if his attorney had inquired into the matter, he would have learned that Taylor actually signed two consent search forms, that the first form was defective due to unspecified errors Taylor made in filling out the form, and that the police destroyed the first form for unknown reasons.  Petitioner contends that Taylor had a reputation for always being intoxicated, that she was likely in that state when she signed the consent form, that her supposed impairment may have caused her to make errors on the form, and that is presumably why the agents destroyed the original document.  Petitioner further suggests that due to her possibly intoxicated state, Taylor's consent was invalid.

In a related vein, Petitioner argues in claim seven that his counsel was ineffective in failing to move to suppress the fruits of the search conducted at the Chipola Avenue premises on the basis that the consent obtained from Taylor was defective.  Petitioner contends that he refused to consent to a search of the house, whereupon the officers who arrested him removed his house keys from his pocket against his will and gave them to Taylor in order to "deceive" her and obtain her consent to search.  To support these allegations, Petitioner has filed an affidavit stating that Taylor did not reside with him in his residence, that he was living there by himself, that Taylor's daughter and Petitioner were separated at the time of his arrest, and that Taylor had not resided there since Petitioner purchased the residence.  (App. A to Doc. No. 26, ¶ 1.)  Petitioner's affidavit further states:  "I learned that the agents who arrested me at my residence gave my keys to Ms. Taylor without my consent or authorization."  (*Id.*)

Petitioner's speculation that Taylor was intoxicated when she consented to the search of the Chipola Avenue residence is just that: rank speculation.  The same can be said for his suggestion that Taylor committed errors on the consent search form.  Petitioner has presented no evidence supporting these allegations.  And even if Taylor did make errors on the consent form, Petitioner has presented absolutely no evidence that the alleged errors were material in any way to the issue of the validity of the consent.  If mistakes were made, it is just as possible that they were purely benign as it is that they were somehow exculpatory to Petitioner.  Since Petitioner has not presented any evidence suggesting that the first consent form (if there ever was one) represented anything that would aid his defense, the officers' alleged destruction of the form (if that actually occurred) is legally inconsequential.  As previously noted, Petitioner himself admits

that the alleged destruction was for "unknown reasons."  Accordingly, this aspect of claims one and seven is without merit.

Regarding the matter of Vivian Taylor's possession of Petitioner's house keys, even if Taylor did not reside in the Chipola Avenue house, and the officers impermissibly orchestrated the delivery of the keys to Taylor against Petitioner's will for the purpose of obtaining Taylor's consent, and, further, that these circumstances would have necessitated suppression of the fruits of the Chipola Avenue search had a motion seeking such relief been filed, the fact remains that Petitioner has suffered no prejudice.  As previously stated, the other evidence against Petitioner was overwhelming.  That evidence would have assured Petitioner's conviction on the drug charges even if all the items seized during the Chipola Avenue search had been excluded.[24]  As for the firearms charges, a review of the Second Superseding Indictment (Crim. Doc. No. 79) and the Government's witness list (Crim. Doc. No. 110) reflects that the felon-in-possession and the § 924(c) counts did not charge Petitioner with possessing any of the guns found during the search of the Chipola Avenue residence.  It is true that the guns seized from Chipola were admitted in evidence; however, that fact alone did not prejudice Petitioner, as numerous other firearms and ammunition were admitted from the two searches of the West Spring Street premises.  Accordingly, Petitioner is not entitled to relief on claims one and seven.[25]

_____

[24]Subtracting the drug quantities seized from the Chipola Avenue search would not have changed Petitioner's sentences, either.

[25]The Government points out in its response that the law regarding third-party consent changed after Petitioner was convicted. (Doc. No. 19 at 11 & n.1.)  In that regard, the Supreme Court held in 2006 that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Georgia v. Randolph,* 547 U.S. 103, 120 (2006).  However,

CLAIM TWO

In claim two, Petitioner asserts that his attorney was ineffective in failing to confer with him regarding the exercise of peremptory challenges during jury selection.  Petitioner attributes counsel's reticence to his fears arising from Petitioner's threats to kill him.[26]

In response, the Government states:

> The record in this case contradicts [Petitioner's] allegation.  At the end of voir dire, the Court stated to Williams, "I'll give you a few minutes to go talk to your client."  Crim. Doc. 205 at 62.  Later, Williams and counsel for the United States announced their challenges for cause and peremptory strikes.  Crim. Doc. 205 at 63-66.  The record reflects that, after the jury had been seated, Williams, on behalf of the defense, accepted the jury.  Crim. Doc. 205 at 66.  Nothing in the record shows that [Petitioner] had been unable to confer with Williams.  Therefore, Williams did not perform deficiently.

(Doc. No. 19 at 12.)  Alternatively, the Government contends that Petitioner has not shown prejudice, because he "has not identified which, if any, of the jurors that he intended to strike were

---

as the Government notes, even if Petitioner's counsel failed to anticipate this change in the law, that circumstance does not render his assistance ineffective.  *See Pitts v. Cook,* 923 F.2d 1568, 1574 (11th Cir. 1991) ("A counsel's pre-*Batson* failure to raise a *Batson*-type claim does not fall below reasonable standards of professional competence, and thus does not render counsel's assistance constitutionally ineffective.").  In any event, Petitioner suffered no prejudice because, as previously discussed, even if the fruits of the Chipola search were suppressed, the remaining evidence against him was overwhelming and his sentence would be the same.

[26]The alleged conflict of interest arising from Petitioner's threats to injure or kill his attorney will be discussed in greater detail in connection with claim nine.

seated on the jury." (*Id.*)  The Government also notes that Petitioner "has not provided affidavits or any other evidence to support his allegation." (*Id.*)

In his reply memorandum, Petitioner contends he attempted to obtain a transcript of the jury selection "from counsel[] and the clerk of court to no avail." (Doc. No. 26 at 9.)  He further states that he is indigent and is therefore "unable to obtain the funds to secure this portion of the record in order to develop the facts for this claim." (*Id.*)

It is unclear whether Petitioner is claiming that his lawyer refused to speak to him at all regarding peremptory challenges, or whether, instead, he is contending the discussion was simply chilled.  The amended § 2255 motion suggests that counsel was unwilling to speak to him at all; however, in his reply to the Government's response, Petitioner refers to a "so-called conversation" and states that defense counsel's fear of Petitioner "hindered any discussion." (Doc. No. 26 at 9.) This raises the possibility that there may have been some discussion between Petitioner and his attorney.  However, whether defense counsel and Petitioner did have such a conversation cannot be gleaned from the record, and the substance of any such discussion would, of course, not have been recorded by the court reporter.  Accordingly, for present purposes, the Court will assume that no such discussion occurred.[27]

---

[27]Nevertheless, it is worth noting that at the very end of the trial, the prosecutor announced in open court: "Your Honor.  The only thing the United States would like to add on the record is that we have been observing Mr. Montgomery's interaction with his attorney during the course of this trial and would like the record to reflect that he has appeared to be actively communicating with his attorney and able to assist in his defense." (Crim. Doc. No. 150 at 566.)  Neither Petitioner nor his attorney offered to controvert this statement.

What the record does reflect is that after the undersigned judge told defense counsel, "I'll give you a few minutes for you to talk to your client" (Crim. Doc. No. 205 at 62), the attorney proceeded to challenge a retired law enforcement officer for cause and exercised six peremptory challenges. (*Id.* at 63-65.) Hence, this is hardly the situation where a defense lawyer exercised no challenges whatsoever and merely rubber-stamped a jury effectively selected by the prosecutor. Rather, Petitioner's counsel performed competently in his task of challenging jurors that might have been unfavorably disposed toward Petitioner. Moreover, a defense attorney's decisions regarding the exercise of juror challenges are customarily presumed to be a matter of tactics or strategy. *See, e.g., Gardner v. Ozmint,* 511 F.3d 420, 425-26 (4th Cir. 2007) (concurring in state court determination that counsel's conduct in not exercising a peremptory strike was a tactical decision that did not amount to ineffective assistance); *Beavers v. Crosby,* No. 8:04-cv-2650-T-24EAJ, 2006 WL 373018, at *7 (M.D. Fla. Feb. 16, 2006) ("Counsel's actions during voir dire are presumed to be matters of trial strategy.") Accordingly, Petitioner has failed to demonstrate that his counsel's performance fell below the objective reasonableness standard, or that the asserted conflict arising from Petitioner's threats toward his counsel adversely affected counsel's performance during jury selection.

Further, Petitioner has not demonstrated prejudice. Petitioner has not pointed to any specific instance in which his attorney failed to consult with him or in which his counsel improperly failed to exercise a challenge. And, regardless of whether Petitioner has had access to the transcript of jury selection, he was there. He heard for himself what the prospective jurors said in response to the Court's questioning, and he laid eyes on those jurors. Hence, regardless of

whether Petitioner can identify any juror by name or quote any particular juror's response in the absence of a transcript, he should certainly be able to say whether there was anything he saw or heard during jury selection that would have caused him to urge counsel to strike any juror. Further, Petitioner's counsel did exercise challenges, and if there was a juror who was ultimately seated who gave Petitioner cause for concern, that is likely something he would remember, given his tremendous stake in the outcome of the trial.  After all, Petitioner was facing the prospect of spending the rest of his life in prison upon conviction.  The bottom line is that instead of presenting any actual information about how his attorney's alleged failure to confer with him during jury selection impacted him in any way, Petitioner relies on conclusory statements regarding the denial of his constitutional rights.

In sum, Petitioner has failed to demonstrate that the outcome of his trial would have been any different had counsel behaved as Petitioner believes he should, or that his attorney's conduct otherwise rendered the trial fundamentally unfair or unreliable.  To reiterate, the evidence against Petitioner was so overwhelming that any reasonable jury would have convicted him.

<u>CLAIM FIVE</u>

In this claim, Petitioner argues that his attorney was ineffective in failing to investigate a law enforcement officer's theft of drugs from the sheriff's department evidence room.  Petitioner suggests that the theft "may" have involved the drug evidence introduced against him at trial.

This claim is wholly speculative.  Petitioner has established not the slightest hint of any connection between the theft and the particular drug evidence introduced against him.  The prosecutor established a proper chain of custody for all of the evidence admitted at trial.  In any

-24-

event, a "[c]hallenge to the chain of custody goes to the weight rather than the admissibility of the evidence." *United States v. Lopez*, 758 F.2d 1517, 1521 (11th Cir. 1985).  There is no indication that the drug evidence admitted at trial was anything other than it was represented to be.  Counsel's performance in not investigating the drug theft - if he even knew about it - was not unreasonable, and Petitioner has failed to establish prejudice.  Hence, Petitioner is entitled to no relief on claim five.

<u>CLAIM SIX</u>

Regarding this claim, Petitioner maintains that his attorney was ineffective in failing to seek dismissal, on multiplicity grounds, of Counts Four, Five, Eight and Nine.  In Petitioner's view, those counts were multiplicitous because they charged the possession of different types of drugs on the same date.  He urges this Court to vacate his convictions on two of the counts.

It is evident that Petitioner misunderstands the concept of multiplicity.  Count Four charged the possession of powder cocaine on August 14, 2003; Count Five charged the possession of crack cocaine on the same date.  Similarly, Count Eight charged possession of powder cocaine on October 2, 2003; Count Nine charged possession of crack cocaine on the same date.  There is nothing multiplicitous about these charges.  The simultaneous possession of two different controlled substances constitutes two separate offenses warranting multiple sentences.  *United States v. Davis,* 656 F.2d 153, 159-60 (11th Cir. 1981).  Legally speaking, powder cocaine and crack cocaine are considered different drugs for purposes of charging and sentencing.  *See, e.g., United States v. Sloan,* 97 F.3d 1378, 1380-83 (5th Cir. 1996) (discussing the different treatment

of crack and powder cocaine for sentencing purposes).  Defense counsel was entirely correct in not attacking these counts on multiplicity grounds, as any such challenge would have been deemed frivolous.  Accordingly, claim six is without merit.

<u>CLAIM EIGHT</u>

Petitioner claims ineffective assistance based on his counsel's asserted failure to explain the consequence of the sentencing enhancement notice the Government filed pursuant to 21 U.S.C. § 851, i.e., that he would be facing a mandatory life sentence upon conviction.  Petitioner maintains that if counsel had explained this consequence to him, he would have foregone trial and pled guilty.         The record flatly belies Petitioner's assertion that he was unaware he was facing a life sentence.  At his initial appearance, the prosecutor stated in open court that based on Petitioner's prior convictions, he was "enhanceable to a life minimum sentence." (Crim. Doc. No. 203 at 4-5.)  The Magistrate Judge also told Petitioner at the same hearing that if the Government filed an enhancement notice, Petitioner would be facing a minimum-mandatory life term.  (*Id.* at 11.)  To underscore the seriousness of the matter, the Magistrate Judge pointed out to Petitioner that a life sentence "is the . . . second . . . most severe penalty in the federal system."  (*Id.*)  Obviously, Petitioner was present at that hearing.  Hence, regardless of whether Petitioner's counsel discussed the subject of sentence enhancement with him, the fact remains that Petitioner was placed on notice about the matter at his first court appearance.

As for Petitioner's speculation that he would have been able to avoid a life sentence by pleading guilty, the Government has filed an affidavit by the prosecutor stating that he made it crystal clear to both Petitioner and his attorneys from the inception of this case that the

Government would accept nothing less than a mandatory life sentence for Petitioner.  Specifically, the prosecutor's affidavit states:

> 3.  The decision was made prior to the arrest of Mr. Montgomery that the only resolution that would be acceptable for the United States was that Mr. Montgomery to [sic] be sentenced to a mandatory term of life imprisonment.
>
> 4.  Immediately upon the arrest of Mr. Montgomery and his initial appearance in federal court both he and his attorney were informed by your affiant that the United States would accept nothing less than a sentence of life imprisonment for Mr. Montgomery.
>
> 5.  Mr. Montgomery did have a number of attorneys either contact your affiant and/or represent him in his pending criminal case. Your affiant personally informed each of those attorneys that there would be no plea offers to Mr. Montgomery and that he must serve life imprisonment.
>
> 6. The undersigned specifically recalls informing the federal public defender Steve Langs and attorney Travis Williams (both of whom represented Mr. Montgomery in the pending federal case) that there would be no plea offers from the United States other than life imprisonment.

(Ex. B to Doc. No. 19, ¶¶ 3-6.)

In short, because the Government was in the driver's seat regarding the filing of a § 851 enhancement notice and the prosecutor steadfastly held to the position that nothing short of a life sentence would satisfy the Government, Petitioner had no prospect of any lesser sentence of imprisonment.  It takes two to negotiate, and the prosecutor had made it abundantly clear that he was unwilling to do so.  Because Petitioner has failed to establish deficient performance or prejudice, claim eight fails.

## CLAIM NINE

Although not a model of clarity, claim nine appears to assert two claims: (1) that Petitioner's attorney rendered generally ineffective assistance due to a conflict of interest arising from counsel's fear that Petitioner would carry out his threat to injure or kill his attorney, and (2) that the Court denied Petitioner's constitutional rights when it failed to inform him of his counsel's motion to withdraw, failed to hold a hearing on that motion, and denied the motion.[28]  Each aspect of this claim will be addressed separately.

Ineffective Assistance

At the outset, the Court is compelled to note that the asserted conflict of interest was not as severe as Petitioner suggests.  It is true that defense counsel filed a motion to withdraw and expressed concern about the information he had received indicating Petitioner planned to harm him at trial.  However, the Court held a hearing on that motion, addressed those concerns, and took remedial measures to protect those who would be present in the courtroom during trial, including, of course, defense counsel.[29]  At the hearing, the Court agreed with the prosecutor that the threats against defense counsel were merely a ploy to prompt a mistrial and delay Petitioner's trial and that Petitioner would persist in this course of conduct against replacement counsel if the Court granted his current attorney's motion to withdraw.  (Crim. Doc. No. 207 at 3-6.)  The Court then made very clear that specific precautions would be taken to protect those in the courtroom, including

---

[28]The Court bases this construction of claim nine on Petitioner's amended § 2255 motion, his reply memorandum, and the Eleventh Circuit's opinion affirming his convictions and sentences.

[29]The hearing was sealed due to the highly sensitive nature of the information: that Petitioner would attack his attorney, attempt to escape, and/or disrupt the court proceedings.  Further, the Marshals Service had received information indicating that Petitioner, with outside help, was planning a violent escape attempt.

Petitioner's counsel.  (*Id.* at 5.)  These measures included leg-irons (concealed from the jury's view) and extra deputy marshals.[30]  (*Id.*)  The Court also expressed its intention to tell Petitioner that it was aware of his plans and that any outbursts or disruption on Petitioner's part would not result in a mistrial, but would instead prompt his removal from the courtroom.[31]  (*Id.* at 11-12.)  The Court stated that it had no concerns regarding Travis Williams' competence to handle the case, which it viewed as "not that difficult," adding, "It's your client that's difficult."  (*Id.* at 6.)

The Court revisited the security issues on the first day of trial, before jury selection.  Based on defense counsel's concerns that Petitioner had threatened to choke him, the Court explored with counsel the issue of requiring Petitioner to wear concealed wrist restraints, in addition to the leg-irons.  (Crim. Doc. No. 174 at 3-4.)  Defense counsel reported that Petitioner acquiesced in this, so the Court implemented that additional security measure, as well.  (*Id.* at 7-8, 10.)  However, the Court made abundantly clear that the jury was not to see the restraints.  (*Id.* at 8, 10.)  The Court also informed counsel that persons entering the courtroom (other than government employees) would be screened using a portable metal detector.  (*Id.* at 5.)

---

[30]The Court also contemplated requiring Petitioner to wear a stun-belt, but determined a sufficient record to justify that measure had not been established.  (Crim. Doc. No. 174 at 2.)

[31]In the event of Petitioner's removal, arrangements were made to have him attend the trial remotely through the use of video equipment.

When Petitioner entered the courtroom, the Court addressed his refusal to take his medication and change out of his jail garb.[32]  Then, the Court issued Petitioner a stern warning regarding his potential misbehavior:

> THE COURT:  All right.  Now, I want to make sure that you understand that nothing you do is going to cause a mistrial in this case.  I have been advised that you have several different types of plans to create a mistrial in this case and let me tell you that none of them are going to work.  And if you have a problem with your medication, because you've refused to take your medication, that's not going to cause a mistrial.  If you're disruptive or you have friends or family in here disrupting the trial, that is not going to cause a mistrial.  You understand that?
>
> THE DEFENDANT: (Nods head)
>
> THE COURT: And I am taking very seriously the fact that you have threatened not only your attorney, but the prosecutor, and have made comments that you're planning to break out during this trial.  It isn't going to happen and I'm not going to put up with anything, you understand that?
>
> THE DEFENDANT: (Nods head)
>
> THE COURT: All right.  We're going to great lengths to make sure that you get a fair trial in this case.  And I would assume that you would want to cooperate in that goal.  All right?
>
> THE DEFENDANT: (Nods head)

(*Id.* at 9-10.)

---

[32]Before Petitioner was brought into the courtroom, defense counsel reported that Petitioner indicated to him that he would not take his medication, because it was the wrong time to take it. (Crim. Doc. No. 174 at 7.)  According to defense counsel, Petitioner related that he was supposed to take the medication at night, and he would do so at the appropriate time.  (*Id.*)  Apparently, this medication reduced Petitioner's aggression and mobility.  (*Id.* at 4.)  Petitioner's attorney further stated that Petitioner declined to change out of his jail uniform, but indicated he might do so the next day.  (*Id.* at 7.)    Finally, defense counsel reported that Petitioner was "fine wearing the wrist restraints."  (*Id.*)

The Court also advised Petitioner of the consequences that would befall him if he misbehaved:

> THE COURT: Let me give you a copy of this [notification of electronic restraint system use].  If there are any disruptions, either you will be required to wear a stun belt, and these documents explain the stun belt to you, or you will be taken downstairs and you can watch the proceedings through a video camera.  We have a, a system in place where you can talk to your attorney during the trial, if that's necessary.
>
> (Counsel confers with Defendant)
>
> THE DEFENDANT: Your Honor, you can put the stun belt on me. I didn't come to give you any kind of problems or nothing, so I mean that.
>
> THE COURT: All right.  Then a stun belt is not necessary.  I just want you to understand what a stun belt is and what it can do to you if you make a false move with it on.  At this point, I'm not concerned enough to, to put the stun belt on you.  But I expect that you will behave during the course of this proceeding.  All right?

(*Id.* at 12.)

Hence, by the time trial commenced, the Court had implemented security measures that greatly reduced the prospect that Petitioner could actually harm his counsel, if he even still desired to do so.  Moreover, after the Court explained the security measures and the consequences of misbehavior, Petitioner announced that he would not cause any trouble.  And, true to his word, he did not; the trial proceeded uneventfully. Thus, although the information regarding Petitioner's threat to harm his counsel had to be taken seriously, by the time the trial actually started, those concerns had diminished somewhat, and they continued to diminish as the trial proceeded without

incident.  Nevertheless, for analytical purposes, the Court will assume that a conflict of interest did exist based on counsel's concerns for his own safety.

The fundamental flaw in Petitioner's ineffective assistance argument is that, by any objective measure, defense counsel Travis Williams' performance was not deficient.  Quite to the contrary; Williams did an admirable job of defending his client in the face of overwhelming guilt.

Before and after trial, Williams met with Petitioner at the jail.[33]  (App. G. to Doc. 10 (Dec. 21, 2005 letter).)  He discussed with Petitioner motions his predecessor counsel had filed on his client's behalf, then persisted in those motions he believed were tenable and withdrew those he felt he could not argue in good faith.[34]  (Crim. Doc. No. 146 at 3.)  During the suppression hearing, Williams cross-examined prosecution witnesses and presented argument.   (*Id.* at 1-51.)

At trial, it was evident that Williams was well-prepared.  Confronted with the massive amount of incriminating evidence against Petitioner, Williams adopted a reasonable - and possibly the only realistically available - defense strategy: to forego challenging the inescapable fact that drugs and guns were found in the West Spring Street and Chipola Avenue residences, and to argue that those items actually belonged to Petitioner's confederates.  Additionally, as is customary in drug cases involving the testimony of confidential informants and cooperating witnesses, defense

---

[33]Prior to Williams' single pre-trial jail visit, members of the Federal Public Defender's Office met with Petitioner four times.  (App. G  to Doc. 10 (Dec. 21, 2005 letter).)  Before sentencing, Williams met with Petitioner at the jail twice more.  (*Id.*)

[34]The pre-trial motions were filed by Petitioner's prior counsel before that attorney was granted leave to withdraw.  (Crim. Doc. Nos. 57, 59.)  Withdrawal was necessitated by a conflict of interest based on prior representation of a government witness against Petitioner.  (Crim. Doc. No. 57.)

counsel attacked those witnesses on the asserted ground that they were fabricating their testimony against Petitioner in an effort to minimize their criminal exposure or reduce their sentences.

During direct examination of the Government's witnesses, Williams objected where appropriate and consistent with his trial strategy.[35]   He cross-examined witnesses, and his questioning was competent.  In that regard, during his cross-examination of cooperating witnesses, Williams established their potential bias by eliciting what they hoped to gain for their cooperation.  (Crim. Doc. No. 147 at 13-14 (Melissa Williams), 33-35 (Eleanor Bevel), 97-98 (Veronica Woulard); Crim. Doc. No. 148 at 377-78 (Andre Neal), 398-99 (Henry Curry); Crim. Doc. No. 149 at 425-26 (William Gillon), 435-36 (Anthony Whites), 444-45 (Kenta Hill), 495 (Jerry Stone).)  He also brought out that many of those witnesses had extensive criminal records.  (Crim. Doc. No. 148 at 378-82 (Andre Neal), 398-99 (Henry Curry); Crim. Doc. No. 149 at 423-25 (William Gillon), 436 (Anthony Whites), 444 (Kenta Hill), 463-65 (Charles Damon).)  Further, as to some of those same witnesses, Williams established that they were using drugs when they observed the matters about which they were testifying.  (Crim. Doc. No. 147 at 15-16 (Melissa Williams), 33 (Eleanor Bevel).)

During his cross-examination of Veronica Woulard, Petitioner's estranged girlfriend, Williams further established that the West Spring Street house was owned by William Montgomery and Betsy Montgomery, rather than by Petitioner; that other people had access to that house; that Woulard was extremely angry with Petitioner because she believed he cheated on her with other women; that Woulard had committed perjury before the grand jury; and that during her

---

[35]Defense counsel also objected to the admission of tangible items of evidence where appropriate and consistent with his trial strategy.

grand jury testimony, Woulard had stated that Petitioner had nothing to do with drugs.  (Crim. Doc. No. 147 at 95-99.)

When Williams cross-examined Melvin Taylor, the confidential informant who engaged Petitioner in the controlled buy of crack cocaine, he established that Taylor had become a CI three days following his arrest on a felony charge; that he had committed crimes while working as a CI, in violation of his agreement with his law enforcement handlers; and that Taylor possibly made an error in a witness statement.   (Crim. Doc. No. 147 at 137-41.)

Williams also questioned Charles Damon, the cooperating witness who tried to purchase crack cocaine from Petitioner during the controlled buy attempted on September 30, 2003. Regarding the incriminating statement Petitioner made to Damon about possessing powder cocaine, Williams pointed out a potential discrepancy between Damon's testimony and the recording of the conversation.  (Crim. Doc. No. 149 at 465-67.)

In his cross-examination of Jerry Stone, Williams developed his defense theory - that the drugs and guns did not belong to Petitioner - by bringing out that Stone sometimes stayed overnight at the West Spring Street address, that Stone was at that location on many occasions when Petitioner was not, and that Stone continued to sell drugs there after Petitioner was jailed. (Crim. Doc. No. 149 at 492-93.)  Williams also forced Stone to admit that  he had initially denied the activities about which he was testifying, and that his story had changed by the time of trial. (*Id.* at 494-95.)

Williams also conducted reasonably effective questioning of the law enforcement witnesses.  In that regard, during his cross-examination of Detective Joseph Sanchez, Williams

followed-up on his questioning of CI Melvin Taylor by eliciting from Sanchez that a confidential informant is less reliable and credible if he or she commits crimes while working as a CI.  (Crim. Doc. No. 148 at 198.)  Williams also established that Sanchez did not conduct a body cavity search of the CI before the controlled buys; that the law enforcement officers did not have constant visual contact with the CI during the controlled buy operation, and had no visual contact at all with the CI while he was in the house; and that no member of law enforcement entered the house with the CI.  (*Id.* at 199-203.)  Williams also elicited from Sanchez that Petitioner's fingerprints were not found on any of the evidence, that none of the firearms were traced to Petitioner,[36] and that no drugs or weapons were found on his person.  (*Id.* at 203.)  Sanchez also admitted that he had never personally seen drugs or guns on Petitioner.  (*Id.* at 204.)  Finally, Williams got Sanchez to concede that the incriminating statements Petitioner made during the first search of the West Spring Street residence did not appear on the videotape of the search.  (*Id.*)

In his examination of case agent Keith Dalton, Williams elicited that Dalton did not identify women who were present during the September 30, 2003, attempted controlled buy and did not ascertain what was inside bags they possessed; that he did not tape witness interviews; that he did not examine telephone records to see if Petitioner was actually communicating by phone with cooperating witnesses or with Michael Montgomery; that the October 2, 2003, search of the West Spring Street premises was not videotaped; that Petitioner was nowhere near the West Spring

---

[36]Similarly, during his cross-examination of Agent Alina Polak, Williams established that none of the weapons about which Polak testified "c[a]me back to [Petitioner] as either the purchaser or dealer," and that Polak did not have any record of "[Petitioner] or someone else bringing him that weapon or him going out of the country or out of state to get that weapon."  (Crim. Doc. No. 148 at 320-21.)

Street residence, and neither were any of his vehicles or his boat, when that search occurred; that he did not find a house key to the West Spring Street home on Petitioner's person; that mail addressed to other Montgomery family members was found at the West Spring Street address, yet those other persons did not live there; that items belonging to Jerry Stone were found in the West Spring Street house; that, like Petitioner's driver's license, the driver's licenses of other Montgomery family members listed their address as 520 West Spring Street; that none of the evidence seized on October 2, 2003, was analyzed for fingerprints, even though that would be considered an important follow-up investigative measure; that none of the officers and agents ever saw Petitioner in personal possession of any drugs or weapons; that, in building the case against Petitioner, Dalton largely relied on confidential informants and cooperating witnesses, and those witnesses were looking for some consideration in exchange for their testimony; and that the criminal complaint pertaining to Jerry Stone indicated that a confidential source reported that Stone lived at 520 West Spring Street.  (Crim. Doc. No. 149 at 522-32, 536.)

When he had nothing else to ask the law enforcement witnesses, Williams extracted from those witnesses that they did not actually know how drugs and guns made their way into the West Spring Street and Chipola Avenue residences.  (Crim. Doc. No. 148 at 249-50 (Nathan Johnson), 274 (James Ellinor), 286 (Robert Patterson), 305 (Michael Drake).)

Further, notwithstanding the overwhelming evidence against Petitioner, Williams mustered a reasonably effective closing argument.  Again, Williams could not credibly deny the existence of the drugs and guns, so his only reasonable alternative was to argue that they belonged to others who had access to the premises.  Early in his closing argument, Williams set the stage for this

scenario by stating: "We stipulated that everything in that room was drugs.  Our argument is those drugs have not been shown to be his or the weapons."  (Crim. Doc. No. 204 at 19.)

Williams stressed the presumption of innocence and urged the jurors to focus on the elements of the charged offenses.  (*Id.* at 19-20.)  He argued that the cooperating witnesses had not testified truthfully about their criminal records, that they had motives to fabricate, and that they were drug users.  (*Id.* at 20-21.)  For those reasons, Williams urged the jury to use caution in evaluating their testimony.  (*Id.* at 21.)

Regarding the July 7, 2003, controlled buy, Williams reminded the jury that the CI involved in that transaction had committed crimes of dishonesty while acting as an informant, and that Detective Sanchez admitted that such behavior would diminish an informant's reliability and credibility.  (Crim. Doc. No. 204 at 22.)  Williams  pointed out that it was evident from the audiotape of that controlled buy that persons other than Petitioner were in the house, and there was no videotape of what actually occurred inside the residence.  (*Id.* at 22-23.)  Williams also noted that a detective testified he saw Petitioner go into the house, but that was not depicted on the law enforcement video.  (*Id.* at 23.)  Williams reminded the jury that the agents did not have constant visual contact with the CI during his trip to the West Spring Street house; that it took ten minutes for the CI to get to that location, yet only five minutes to return; that most of the audio recording of the CI's travel to and from the residence was inaudible; and that due to the CI's drug connections in the area, there were many places along the way where the CI could have bought the drugs he later claimed he obtained from Petitioner.  (*Id.* at 23-24.)  Williams also pointed out that the officers did not conduct a body cavity search of the CI, despite the fact that it is common for

drug users to hide drugs in their body cavities.  (*Id.* at 24.)  By pointing out all these things, Williams attempted to cast doubt on the veracity of the CI and the controlled buy in general, stating, "They've got to bring you more than an unreliable informant."  (*Id.* at 25.)

Turning to the August 14th search of the West Spring Street premises, Williams reiterated that he was not denying that "plenty" of drugs and weapons were found there.  (Crim. Doc. No. 204 at 25.)  However, he noted that when the law enforcement officers arrived, there were three persons present - Petitioner, Jerry Stone, and Eleanor Bevel - yet the police focused on Petitioner and let the other two "go away."  (*Id.*)  Williams then focused on Agent Dalton's admission that a CI had reported that Jerry Stone lived at the West Spring Street address, that Petitioner's vehicles and boat were not at the residence, and that officers did not find a key to the residence on Petitioner's person. (*Id.* at 25.) Regarding the discovery of mail addressed to Petitioner, Williams argued that Jerry Stone and three of Petitioner's relatives also had mail there, yet they never lived in the West Spring Street home.  (*Id.* at 25-26.)  Similarly, Williams pointed out that, just like Petitioner's driver's license, the licenses of other Montgomery family members also listed the West Spring Street address.  (*Id.* at 26.)  Williams also noted that the West Spring Street property had been in the Montgomery family "for years and years."  (*Id.*)  Further, Williams reminded the jury that not one of Petitioner's fingerprints were found on any of the evidence.  (*Id.*)  What the evidence did show, argued Williams, was that Petitioner was living at the Chipola Avenue home. In that regard, Williams stated: "I think that your common knowledge would show you where he was staying at night was where all his vehicles were and he lived there with Vivian Taylor.  That he was living at Chipola."  (*Id.* at 27.)

Concerning Petitioner's admission during the August 14th search, to the effect that he was living alone in the West Spring Street home, Williams suggested that the officers were "stretching" their characterization of what Petitioner actually said, and that he was merely "[taking] some responsibility for the house" because "it was his family's house." (Crim. Doc. No. 204 at 27.) Williams noted that the statement as characterized by the police did not appear on the videotape of the search. (*Id.*) Williams further argued that notwithstanding the fact that an agent testified that he was responsible for videotaping all relevant evidence that could be used by the prosecution, Petitioner's incriminating statement to Detective Sanchez, that any narcotics found in the residence were Petitioner's, also did not appear on the videotape. (*Id.*)

Williams then presented a "mere presence" argument, i.e., that an individual's "mere proximity to drugs doesn't make you guilty." (Crim. Doc. No. 204 at 28.) Instead, noted Williams, "You have to have dominion [and] control over [the drugs]." (*Id.*) Williams also reminded the jury that Petitioner was not just charged with possession, but with possession with intent to distribute, and that the Government was required to prove that Petitioner intended to distribute those drugs, and that they "weren't Jerry Stone's drugs." (*Id.*) Williams then stated, "The same goes with the firearms," and asked, rhetorically, "How do we know those weren't Jerry Stone's?" (*Id.*) Continuing with that theme, Williams suggested that if Jerry Stone was on trial in Petitioner's place, the same witnesses who testified they had seen Petitioner with firearms would likely say the same thing about Stone in order to "get their freedom." (*Id.*) Williams also noted that none of the firearms were traced back to Petitioner. (*Id.*)

Concerning the October 2, 2003, search at West Spring Street, Williams pointed out that Petitioner was nowhere near the house on that date. (Crim. Doc. No. 204 at 29.) He suggested that in light of Petitioner's arrest on August 14th, it would have been "unbelievably dumb" and defied "common sense" for Petitioner to have "load[ed] up all the drugs and guns back in that place[.]" (*Id.*) Williams also noted that Jerry Stone "was still around," since he "wasn't arrested the first time." (*Id.*) Williams then argued that Petitioner did not have dominion and control over, or intent to sell, the drugs, and that it was not really known to whom the drugs and guns belonged. (*Id.*) He reiterated that other people, including Jerry Stone, had access to the house. (*Id.*)

Regarding the attempted buy on September 30, 2003, Williams stressed that the CI did not purchase any drugs from Petitioner. (Crim. Doc. No. 204 at 29.) As for Petitioner's incriminating statement to the effect that he had powder cocaine to sell, but not crack cocaine, Williams noted that the word "crack" did not appear on the recording of that conversation. (*Id.* at 30.) Ridiculing the suggestion that the audio transmitter "missed" that comment, Williams stated, "What a coincidence. What a coincidence." (*Id.*) Concerning the recordings of Petitioner's conversations, including the incriminating statements Petitioner made during his phone calls while in the county jail, Williams argued that the Government was merely relying on "its interpretation" of what was really being discussed during those conversations. (*Id.*)

Addressing the conspiracy charge, Williams noted that over a three-year period, only the cooperating witnesses and confidential informants, all of whom were "getting some kind of deal," claimed to have seen Petitioner with guns or drugs. (Crim. Doc. No. 204 at 30-31.) Williams then asked, if the drug dealing at the Montgomery Hole was really as rampant as the Government

suggested, why didn't the Government install a video camera in the woods near the residence?  (*Id.* at 31.)  After all, he noted, the officers succeeded in placing a video camera there every time they tried.  (*Id.*)  Or, Williams queried, why not introduce an undercover officer into the residence (someone more trustworthy than "unreliable people") to establish a relationship with Petitioner?  (*Id.*)  Williams also pointed to the absence of wiretaps and videotapes (of the actual drug deals, presumably).  (*Id.*)  Stressing that a conspiracy is "about communicating with each other," Williams noted that even though the officers and agents knew the Montgomery brothers' telephone numbers and recovered their phone records, they never checked those records, or those of the cooperating witnesses, to see if the brothers were calling each other or the cooperating witnesses were communicating with Petitioner.  (*Id.* at 31-32.)

As for Veronica Woulard's testimony, Williams reminded the jury that Woulard was an admitted perjurer, that she was receiving immunity on the drug charges, and that she was even getting favorable consideration from the Government in connection with her plea to the perjury charge.  (Crim. Doc. No. 204 at 32.)  Williams suggested that Woulard had lied on the stand and urged the jury to reject her testimony entirely.  (*Id.*)  Further, Williams cast suspicion on Woulard's claim that she never saw Michael Montgomery sell crack cocaine; he suggested that was something Woulard should have seen based on her status as a co-conspirator and as Petitioner's girlfriend.  (*Id.* at 32-33.)  Williams also opined that Woulard's testimony appeared rehearsed.  (*Id.* at 33.)

Concluding his closing argument, Williams attacked the reliability and credibility of the confidential informants and cooperating witnesses; he highlighted those witnesses' motivation to

curry favor with the Government; he pointed out the necessity of viewing their testimony, as well as evidence regarding incriminating statements made by Petitioner, with caution; and he reiterated the absence of corroborating evidence such as videotapes of the drug deals, undercover officers, fingerprints, photographs of Petitioner with drugs, and "cell phone traces." (Crim. Doc. No. 204 at 33-36.)

In sum, notwithstanding the bleak picture the evidence presented for Petitioner, Travis Williams mounted a reasonable and competent defense of his client. However, defense counsel could only play the cards he was dealt, and the overwhelming evidence of his client's guilt dealt him a weak hand. In the Court's view, the evidence against Petitioner was so strong that no attorney could have obtained an acquittal. Accordingly, by any reasonable assessment, defense counsel's performance was not deficient, the asserted conflict of interest arising from Petitioner's threats against his counsel did not adversely affect his attorney's performance, and Petitioner has suffered no prejudice. For these reasons, the ineffective assistance aspect of claim nine must be denied.

<u>This Court's Handling of the Motion to Withdraw</u>

At the outset, Petitioner is incorrect in stating that the Court did not hold a hearing on his attorney's motion to withdraw or inquire into the nature of the asserted conflict. The Court did both. (Crim. Doc. Nos. 207, 209.) As the Eleventh Circuit recognized in its opinion affirming Petitioner's convictions and sentences, "The record indicates that the district court did consider at the status conference defense counsel's arguments in support of his motion to withdraw." *Montgomery,* 152 Fed. Appx. at 825 n.4 (Crim. Doc. No. 196 at 6 n.4). While the status hearing

was set to address security issues pertaining to the case, the very first matter the Court considered at that hearing was defense counsel's motion to withdraw.  (Crim. Doc. Nos. 207 at 2-7; 209.) The fact that the Court decided to seal the hearing in light of security concerns does not alter the fact that a hearing was held.

On direct appeal, the Eleventh Circuit considered Petitioner's argument that "the district court deprived him of his due process and equal protection rights (1) by failing to notify him of the motion to withdraw and (2) by failing to hold a hearing on the motion to withdraw." *Montgomery,* 152 Fed. Appx. at 825 n.4 (Crim. Doc. No. 196 at 5 n.4).  Addressing those arguments, the Eleventh Circuit stated, "Defendant did *not* raise these constitutional arguments below: we review them for plain error and reject them."  (emphasis in original) *Montgomery,* 152 Fed. Appx. at 825 n.4 (Crim. Doc. No. 196 at 5-6 n.4).  Hence, these arguments have already been resolved against Petitioner.

Petitioner's remaining argument, that this Court's denial of the motion to withdraw deprived him of the effective assistance of counsel, is without merit; as demonstrated throughout this Order, there was no ineffective assistance.

## CLAIM TEN

In this claim, Petitioner argues that Travis Williams failed to advise him of the option of obtaining a "cooperating plea."[37]  Again, Petitioner attributes this asserted lapse to his attorney's fears arising from Petitioner's threats.  However, as previously stated, the prosecutor's affidavit

---

[37]Petitioner's assertion that counsel failed "to advise him that it was impossible for him to obtain an acquittal," (Doc. No. 10 at 11), seems at least an implicit concession that the evidence against him was overwhelming.

establishes that the Government was unwilling to entertain a plea to anything short of life imprisonment and, further, that both Petitioner and his counsel were informed of that fact. Hence, there was simply no viable plea option to discuss. Defense counsel had no reason to advise Petitioner concerning an option that did not exist. Accordingly, claim ten fails.

<u>CLAIM ELEVEN</u>

Petitioner maintains that after entering into a stipulation that Petitioner was a convicted felon (for the purpose of avoiding disclosing to the jury the nature and number of Petitioner's prior convictions in connection with the felon-in-possession counts) his attorney failed to ensure that the indictment submitted to the jury was redacted. This contention is simply wrong. After the Government rested its case, the prosecutor tendered a proposed redacted Second Superseding Indictment to Petitioner's attorney and the Court, and defense counsel announced that the document was agreeable to the defense. (Crim. Doc. No. 149 at 544-45.) The Second Superseding Indictment submitted to the jury was, in fact, redacted; it deleted Petitioner's numerous prior convictions and substituted in their place the language, "a felony." (Crim. Doc. No. 106.) Hence, this claim is specious.

<u>CLAIM TWELVE</u>

Regarding this claim, Petitioner contends that his attorney should not have stipulated to the type of cocaine base attributable to him. He maintains his counsel should have put the Government to its burden of proving that the cocaine base involved in his case was actually crack cocaine.

Concerning this claim, too, Petitioner has failed to demonstrate that his counsel's performance was deficient. As previously discussed, Travis Williams made a tactical decision not

to challenge the type and quantity of drugs introduced in the case, and to instead focus his efforts on persuading the jury that the drugs belonged to others with equal access to them. Again, this was a reasonable course of action, and perhaps the only realistic alternative available to counsel given the strength of the case against Petitioner. Further, even if Williams had not entered into the stipulation regarding the drugs, the Government would have undoubtedly called the DEA chemist who tested the drugs as a witness to establish the very facts covered by the stipulation.[38] Finally, Petitioner has presented not a shred of evidence that the substances stipulated to be crack cocaine were anything but that. Petitioner has thus failed to show deficient performance or prejudice.

### CLAIMS THIRTEEN AND FOURTEEN

In claim thirteen, Petitioner contends his attorney failed to properly advise him concerning his right to testify, again because of his fears that Petitioner would kill him. More specifically, Petitioner says that Travis Williams "mis-advised" him that the Court would not remove his restraints if he testified, that there would be an extra security presence near him if he took the witness stand, and that Petitioner would be prejudiced if the jury saw his restraints or took notice of the additional marshals. Petitioner claims his counsel told him he would not be calling him to

---

[38]At a status conference held on January 16, 2004, the prosecutor informed the Court that he had learned that morning that the DEA chemist was pregnant, that she was due to deliver on February 19th, and that she did not feel she could travel on February 2nd, the date the trial was scheduled to commence. (Crim. Doc. No. 206 at 7.) However, the prosecutor stated he understood that defense counsel was willing to stipulate to the lab reports and their admissibility, and Travis Williams confirmed that statement. (*Id.*) If defense counsel had not so stipulated, presumably the prosecutor would have moved for a continuance of the trial date. Under the circumstances presented, the Court likely would have granted a continuance and, at the rescheduled trial, the chemist would just as likely have testified to the facts otherwise covered by the stipulation.

testify for these reasons.  Petitioner maintains these assumptions amounted to speculation on his attorney's part.  He argues his counsel should have obtained a ruling regarding these matters, and his failure to do so left him without an appellate record from which to argue that the Court abused its discretion with regard to the heightened security measures.

In claim fourteen, Petitioner advances the related argument that, instead of assuming what the Court would or would not do, his attorney should have argued to the Court that Petitioner had a Fifth Amendment right to testify without any extra security measures.

The Court finds that Petitioner's counsel's conduct was not deficient and that it did not prejudice Petitioner.

At the outset, the Court observes that the decision of whether Petitioner should testify was not counsel's to make; it was Petitioner's.  And, regardless of what advice defense counsel gave Petitioner regarding taking the witness stand, the record reflects that it was Petitioner who made the ultimate decision not to testify.  In that regard, the following exchange occurred after the Government rested its case:

> MR. WILLIAMS: Your Honor, Mr. Montgomery, I've discussed with him thoroughly that he does have the right to testify in this case.  And in talking with Mr. Montgomery, he's not going to be testifying in this case.
>
> THE COURT: All right.  Mr. Montgomery, you understand it's your decision whether or not you testify?
>
> THE DEFENDANT: Yes, Ma'am.
>
> THE COURT: Obviously, you have to listen to your lawyer's advice.  Is it your decision not to testify?
>
> THE DEFENDANT: Yes, Ma'am.

(Crim. Doc. No. 149 at 543-44.)

Further, trial counsel was correct in advising Petitioner that extra security measures would have remained in place had he chosen to testify. The information regarding Petitioner's plans to commit acts of violence and escape was extremely serious, and this left the Court with no choice but to increase security during the trial. Further, even though Petitioner did not misbehave after the trial began, the information regarding Petitioner's plans was sufficiently serious that this Court was compelled to keep the increased security precautions in place for the trial's duration. And, while the Court and counsel tried very hard to keep the jury from noticing the extra security measures, defense counsel was correct in observing that the jury might have taken note of them had Petitioner testified. However, in the final analysis, the extra security measures were a circumstance of Petitioner's own making. He created the necessity for them, and he even acquiesced in the specific measure of the wrist restraints. It is thus somewhat ironic for him to now complain of his counsel's approach in dealing with those security precautions.

In any event, defense counsel's strategic decision to advise his client against testifying did not amount to deficient performance. Simply put, it would have been disastrous for Petitioner to take the witness stand. Inevitably, the prosecutor would have confronted Petitioner with the mound of evidence against him, including his own incriminating words on the recordings of the controlled buy and the jail conversations. Undoubtedly, Petitioner would have done a much worse job of attempting to explain that evidence away than his attorney did, and this would have limited his counsel's options regarding trial strategy and closing argument. Based on these considerations,

counsel's decision to advise Petitioner not to testify was not unreasonable, and it did not adversely affect his representation of his client at trial.

Further, Petitioner has failed to demonstrate prejudice.  Once again, Petitioner cannot overcome the insuperable obstacle of the overwhelming evidence of his guilt.  In the face of that evidence, Petitioner says he would have testified that certain of the cooperating witnesses either did not know him, or that they knew him only as a breeder of fighting dogs, and, in any event, that they were all lying; that his parents became suspicious that Jerry Stone was dealing drugs, so they evicted him from the residence they were renting to him (521 West Spring Street); and that Veronica Woulard was vindictive toward him because he left her for another woman and made Woulard leave his residence.   (App. A to Doc. No. 26, ¶ 7.)  Plainly, given the strength of the Government's case, this proffered testimony would not have produced a different outcome, and the absence of this comparatively weak testimony did not render the trial fundamentally unfair or unreliable.

Petitioner's contention that he simply did not know many of the cooperating witnesses and that they were all lying would have rung hollow, particularly given the fact that those witnesses presented a consistent picture regarding Petitioner's drug-dealing activities and practices.  As for Jerry Stone, it was quite obvious that Stone was a drug dealer, and reinforcing that fact would not have helped Petitioner unless Petitioner could also demonstrate that he was not himself in that same business.  Regarding Veronica Woulard, Petitioner's own counsel brought out Woulard's hostility toward Petitioner during his cross-examination of her.  Moreover, Petitioner's affidavit does not address the testimony of the numerous law enforcement witnesses, Petitioner's

incriminating statements, the recordings of the controlled buys and the jail conversations, and the heap of physical evidence (including all of the guns and drugs) seized from premises under Petitioner's control.   Accordingly, it is clear that Petitioner's proffered testimony would have made no difference whatsoever.

Finally, the Court rejects Petitioner's argument that his counsel did not develop a sufficient record regarding the heightened security arrangements.   As previously discussed, the Court addressed the increased security measures in depth on several occasions before the trial began. Contrary to Petitioner's assertions, the record was sufficiently developed on this point.   In that connection, the Eleventh Circuit appears to have had no trouble with the state of the record in addressing and rejecting Petitioner's appellate arguments regarding heightened security measures. *Montgomery,* 152 Fed. Appx. at 826 (Crim. Doc. No. 196 at 6-7).

Based on the foregoing, the Court rejects claims thirteen and fourteen.

<u>CLAIM FOUR</u>

In connection with this claim, Petitioner argues that his attorney's "multiple errors" denied him the effective assistance of counsel.   Based on the foregoing analysis, the Court rejects this claim, as well.   Petitioner has not shown that his counsel's conduct was deficient or that Petitioner suffered any prejudice.

**B.   Remaining Claim**

<u>CLAIM THREE</u>

Claim three asserts a denial of due process.   Petitioner complains that because of the allegations that he was an escape risk, he was placed in administrative detention while confined

in the county jail awaiting trial.  He contends this circumstance "hindered" his right to confer with his attorney.   More specifically, Petitioner asserts that this deprived him of the right to communicate with his attorney via the mail and by telephone.

At the outset, it is important to note that Petitioner is not claiming that he was completely deprived of the ability to confer with his attorney by any means.  Rather, his grievance is that such communication was "hindered," and that he and his counsel could not communicate by mail and by phone.  As previously noted, jail records reflect that Petitioner's successive attorneys visited him five times during the pre-trial phase of the case, and another two times prior to sentencing. (App. G. to Doc. No. 10) (Dec. 21, 2005 letter).  Moreover, the memorandum from the Marshals Service to jail personnel, attached to Petitioner's amended § 2255 motion, requested that Petitioner "be held in administrative lock down with no outside contact, except for his attorney of record who will be permitted to visit him at the facility in approved visitation areas, until further notice."[39] (*Id.*) (Jan. 21, 2004 memo).  Hence, the record reflects that Petitioner was able to have in-person access to his attorneys.

In any event, the Government correctly notes that this claim is procedurally barred.  It is evident from the Government's memorandum in opposition to the amended § 2255 petition, Petitioner's reply memorandum, and the Eleventh Circuit's opinion affirming Petitioner's convictions and sentences, that Petitioner did not raise this claim on appeal.  "A claim not raised

---

[39]After the trial was over, Petitioner filed a grievance with the jail regarding these security restrictions.  He attached a copy of his grievance to his amended § 2255 motion.  (App. G to Doc. No. 10) (Feb. 8, 2004, Request for Administrative Remedy).   The document incorporates the jail's response to his grievance.  That response reflects that the jail would also allow Petitioner to have "controlled phone calls" with his attorney.  (*Id.*)

on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice."

*McCoy v. United States,* 266 F.3d 1245, 1258 (11th Cir. 2001).

In his reply memorandum, Petitioner suggests that his attorney's failure to investigate the jail restrictions and to file a motion challenging those conditions resulted in a record insufficiently developed to permit his appellate counsel to raise this issue on direct appeal. However, "[f]or a claim of ineffective assistance of counsel to serve as cause to overcome a procedural bar, the claim of ineffectiveness must be meritorious." *Thompson v. Sec'y for Dep't of Corr.,* 517 F.3d 1279 (11th Cir. 2008). Petitioner has not met that requirement. Given the legitimate and quite serious security concerns that prompted the jail restrictions, and the fact that Petitioner's various attorneys were able to personally meet with him numerous times, counsel's failure to file a motion complaining of the jail restrictions was not unreasonable. Further, even if trial counsel's performance in this regard could be deemed deficient, Petitioner has not shown resulting prejudice. On that point, Petitioner has offered not even a hint of a suggestion of how the "hindrance" about which he complains actually impacted his defense. Accordingly, claim three stands procedurally barred.

## V. CONCLUSION

As the foregoing demonstrates, Petitioner is not entitled to post-conviction relief.[40] Accordingly, it is ORDERED as follows:

---

[40]Any of Petitioner's allegations not specifically addressed herein have been deemed meritless.

1.  Petitioner's amended motion to vacate, set aside, or correct an illegal sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 10), filed on October 2, 2006, is DENIED, and this case is DISMISSED WITH PREJUDICE.

2.  The Clerk shall enter judgment accordingly and is directed to close this case.

3.  The Clerk is further directed to file a copy of this Order and the resulting judgment in criminal case number 6:03-cr-210-Orl-22GJK.  Additionally, the Court notes that the initially-filed § 2255 motion remains pending in the criminal case (Crim. Doc. No. 199), despite the fact that the Court denied that motion as moot in this civil case.  *See* Doc. No. 11.  Further, the amended § 2255 motion (Doc. No. 10) has not been docketed in the criminal case.  To avoid confusing the record, the Court deems it appropriate for the Clerk to docket the amended § 2255 motion (Doc. No. 10) in the criminal case.  After doing so, the Clerk shall terminate both the initially-filed § 2255 motion and the amended § 2255 motion in the criminal case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 14th day of April, 2008.

ANNE C. CONWAY
United States District Judge

Copies furnished to:
Counsel of Record
Charles H. Montgomery
    United States Penitentiary
    Reg. No.: 25433-018
    P.O. Box 26030
    Beaumont, TX. 77720